UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| GARY PETERSON, Derivatively on Behalf of FISERV, INC., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL P. LYONS, ROBERT W. HAU, KENNETH F. BEST, HARRY F. DISIMONE, HENRIQUE DE CASTRO, WAFAA MAMILLI, CHARLOTTE YARKONI, LANCE M. FRITZ, AJEI S. GOPAL, STEPHANIE E. COHEN, FRANK BISIGNANO, DOYLE R. SIMONS, HEIDI G. MILLER, and KEVIN M. WARREN, <br><br> Defendants, <br><br> -and- <br><br> FISERV, INC., a Wisconsin Corporation, <br><br> Nominal Defendant. | Civil Action No. <br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATIONS OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF
CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint for

Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust

Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations

specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also

based on the investigation of plaintiff's counsel, which included, among other things, a review of

public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news

reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by plaintiff on behalf of nominal defendant Fiserv, Inc. ("Fiserv" or the "Company") against certain of its officers and directors for violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breach of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of law. These wrongs resulted in significant damages to Fiserv's reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2.      Fiserv provides payments and financial services technology solutions in the United States and internationally. The Company's flagship and most important product is "Clover," a cloud-based point-of-sale ("POS") and business management platform that facilitates the secure processing of credit, debit, and mobile payment transactions on behalf of financial institutions and their customers. Fiserv operates through two primary business segments: (i) Merchant Solutions, which includes the Clover platform; and (ii) Financial Solutions. Clover revenue is primarily generated from transaction fees paid by merchants, which are computed as a percentage of the dollar value for goods and services charged through Clover. Clover also generates revenue from subscription-based value-added services (sometimes also referred to as "value-added solutions") ("VAS"). Fiserv acquired Clover when it bought the payments processing company First Data Corporation ("First Data") in July 2019 for $22 billion. First Data's Chief Executive Officer ("CEO"), defendant Frank Bisignano ("Bisignano"), became President and Chief Operating Officer and later CEO of Fiserv. Investors paid close attention to Clover's growth as a bellwether for Fiserv's success, particularly the growth in its VAS. In particular, the market looked for growth

in Clover's gross payment volume ("GPV"), which represents the total monetary value of transactions processed through the Clover platform.

3. Fiserv also had an older payment gateway for small business merchants, Payeezy. Payeezy, which provided merchants basic e-commerce functions, was cheaper than Clover and appealed to more cost-conscious businesses, including smaller businesses. Because of their focus on price, Payeezy customers were less enticing to Fiserv (and the market) than new Clover customers, as they did not need Clover's VAS functions.

4. The Individual Defendants (as defined herein) often touted the growth of Clover. Beginning in July 2024, the Individual Defendants often claimed that they achieved almost all of Clover's growth from new merchants, instead of moving existing Fiserv customers, such as those using Payeezy, to Clover (known as "back book" conversions or signups). For instance, defendant Robert W. Hau ("Hau"), Fiserv's Chief Financial Officer ("CFO"), told the market that back book merchants that switched to Clover generated only 10% of Clover's revenue growth. However, this was untrue. Fiserv forcibly migrated as many as 200,000 merchant locations on Payeezy to Clover from late 2023 through the first half of 2024. This back book conversion provided a rapid boost to Clover's revenue and GPV. This boost, however, was short term and unsustainable, as the cost-conscious Payeezy merchants would move to lower-cost alternatives.

5. Instead of promptly disclosing these material facts, the Individual Defendants misled investors. During this period, the Company repurchased over $6.9 billion of its own stock at artificially inflated prices. Additionally, while the Company's stock price was artificially inflated, certain insiders sold over $44.2 million worth of their personally held Fiserv stock while knowing the truth about Fiserv's revenue and growth prospects.

6.      The market slowly learned the truth about Clover's financial health through several disclosures.  On April 24, 2025, when Fiserv held an earnings call in connection with its financial results for the first quarter of 2025 (the "Q1 2025 Call").  During the Q1 2025 Call, Fiserv reported a material decline from 2024 GPV growth rates of between 14% and 17%, down to 8% for the first quarter of 2025, despite Clover's revenue growth remaining relatively flat for the quarter.

7.      On this news, Fiserv's market capitalization plunged 18.5%, or $40.20 per share, on April 24, 2025, to close at $176.90 per share compared to the previous trading day's closing of $217.10 per share, erasing almost $22.2 billion in market capitalization in a single day.  Although this news partially revealed the truth, the Individual Defendants continued to mislead investors by failing to disclose that a substantial number of former Payeezy merchants cancelled their Clover contracts and this was the cause of the decline in growth.

8.      On May 6, 2025, defendant Bisignano resigned and was replaced with defendant Michael P. Lyons ("Lyons") as CEO.  Less than two weeks later, on May 15, 2025, Fiserv disappointed investors by disclosing that Clover's GPV growth deceleration would continue throughout 2025.  On this news, Fiserv's market capitalization plunged 16.2%, or $30.73 per share, on May 15, 2025, to close at $159.13 per share compared to the previous trading day's closing of $189.86 per share, erasing over $17 billion in market capitalization in a single day.

9.      The truth fully emerged on July 23, 2025.  That day, Fiserv released its results for the second quarter of 2025.  The Company lowered the top end of its full-year organic growth guidance range and reported that its quarterly organic revenue in the Merchant Solutions segment had decelerated to 9% year-over-year from 11% in the previous quarter.  During the conference call to discuss second quarter of 2025 results, defendant Lyons stated, "just on the overall organic growth rate for the company, we obviously refined to approximately 10% from 10% to 12%."

10.     On this news, Fiserv's market capitalization fell for two days by 15.6%, or $25.90 per share. On July 24, 2025, the stock price closed at $140.08 per share compared to July 22, 2025's closing of $165.98 per share, erasing over $14 billion in market capitalization.

11.     As a direct result of this unlawful course of conduct, Fiserv is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Southern District of New York on behalf of investors who purchased Fiserv's shares titled *City of Hollywood Police Officers' Retirement System v. Fiserv, Inc. et al.*, Case No. 1:25-cv-06094 (the "Securities Class Action").

12.     On August 28, 2025, plaintiff sent a litigation demand to Fiserv's Board of Directors (the "Board") detailing the wrongdoing alleged herein, demanding that the Board investigate and bring litigation against the culpable fiduciaries (the "Demand").[1] On September 15, 2025, Sullivan & Cromwell LLP ("Demand Counsel") for the Board informed plaintiff's counsel by e-mail that the Board "is aware of your letter dated August 28 and the demands asserted therein purportedly on behalf of an alleged Fiserv stockholder. The Board of Directors will consider those demands in accordance with governing Wisconsin law. We will advise you of any further actions taken by the Fiserv Board of Directors in connection with this matter."[2] Ninety days have passed since plaintiff made his Demand, yet the Board has refused to make a decision regarding whether to accept or reject the Demand. Further, the Board and the Demand Counsel have not indicated that the Board has taken any actions to reform or improve the Company's corporate governance and internal procedures. As such, plaintiff has not received a substantive response to the Demand.

---

[1] A true and correct copy of the Demand is attached hereto as Exhibit A.

[2] A true and correct copy of the Board's response is attached hereto as Exhibit B.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because plaintiff's claims raise a federal question under sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a), and 78t-1) and SEC Rule 10b-5 (17 C.F.R §240.10b-5) promulgated thereunder.  This Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

14.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

15.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Fiserv is incorporated in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Fiserv, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

17.     Plaintiff Gary Peterson was a shareholder of Fiserv at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Fiserv shareholder.

**Nominal Defendant**

18.     Nominal defendant Fiserv is a Wisconsin corporation with principal executive offices located at 600 N. Vel R. Phillips Avenue, Milwaukee, Wisconsin.  The Company is a global provider of payments and financial services technology solutions.  Fiserv serves clients around the globe, including merchants, banks, credit unions, other financial institutions, corporate and public sector clients.  As of December 31, 2024, Fiserv had over 38,000 employees worldwide.

**Defendants**

19.     Defendant Lyons has been Fiserv's CEO and a director since May 2025.  He served as Fiserv's President and CEO-elect from January 2025 to May 2025.  Defendant Lyons is named as a defendant in the Securities Class Action.

20.     Defendant Hau has been Fiserv's Special Advisor since October 2025.  Defendant Hau served as Fiserv's CFO from March 2016 through October 31, 2025.  He is named as a defendant in the Securities Class Action.  Fiserv paid defendant Hau the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Total |
|---|---|---|---|
| 2024 | $750,000 | $5,656,705 | $6,406,705 |

21.     Defendant Kenneth F. Best ("Best") has been Fiserv's Chief Accounting Officer since April 2016.  He was also Fiserv's Senior Vice President, Corporate Controller from January

2014 to February 2016, and also Vice President, Corporate Controller from September 2010 to December 2013. Defendant Best is named as a defendant in the Securities Class Action. While in possession of material, nonpublic information concerning Fiserv's true business health, defendant Best sold 20,821 shares of his personally held Fiserv stock for $4.4 million in proceeds.

22.     Defendant Harry F. DiSimone ("DiSimone") has been a Fiserv director since February 2018. He has been a member of Fiserv's Audit Committee since at least April 2024. Defendant DiSimone has been a member of the Risk Committee since at least April 2024 and Chair of Fiserv's Risk Committee from at least April 2024 to at least April 2025. Fiserv paid defendant DiSimone the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2024 | $150,000 | $230,035 | $380,035 |

23.     Defendant Henrique De Castro ("De Castro") has been a Fiserv director since July 2019. Defendant De Castro was a member of Fiserv's Audit Committee from at least April 2024 to at least April 2025. Fiserv paid defendant De Castro the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2024 | $130,000 | $230,035 | $360,035 |

24.     Defendant Wafaa Mamilli ("Mamilli") has been a Fiserv director since June 2021. She has been the Chair of Fiserv's Risk Committee since at least November 2025 and a member of the committee since at least April 2024. Fiserv paid defendant Mamilli the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2024 | $130,000 | $230,035 | $360,035 |

25.     Defendant Charlotte Yarkoni ("Yarkoni") has been a Fiserv director since August 2023. She has been a member of Fiserv's Risk Committee since at least April 2024. Defendant

Yarkoni was also a member of Fiserv's Audit Committee from at least April 2024 to at least April 2025. Fiserv paid defendant Yarkoni the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2024 | $130,000 | $230,035 | $360,035 |

26.     Defendant Lance M. Fritz ("Fritz") has been a Fiserv director since February 2024. Defendant Fritz has been a member of Fiserv's Audit Committee since at least April 2024. Fiserv paid defendant Fritz the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2024 | $113,214 | $280,665 | $393,879 |

27.     Defendant Ajei S. Gopal ("Gopal") has been a Fiserv director since March 2024. He was a member of Fiserv's Risk Committee from at least April 2024 to April 2025. Fiserv paid defendant Gopal the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2024 | $104,286 | $266,191 | $370,477 |

28.     Defendant Stephanie E. Cohen ("Cohen ") has been a Fiserv director since March 2025. She has been a member of Fiserv's Audit Committee since May 2025, and also a member of the Risk Committee since May 2025.

29.     Defendant Bisignano was Fiserv's CEO from July 2020 to May 2025; Chairman of the Board from May 2022 to May 2025; a director from July 2019 to May 2025; President from July 2019 to January 2025; and Chief Operating Officer from July 2019 to July 2020. He is named as a defendant in the Securities Class Action. While in possession of material, nonpublic information concerning Fiserv's true business health, defendant Bisignano sold 145,000 shares of his personally held Fiserv stock for $25.7 million in proceeds. Fiserv paid defendant Bisignano the following compensation as a director:

| Fiscal Year | Salary | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2024 | $1,400,000 | $22,016,635 | $357,848 | $23,774,483 |

30.     Defendant Doyle R. Simons ("Simons") was Fiserv's Chairman of the Board from May 2025 to January 2026; a director from August 2007 to January 2026; and also Lead Independent Director from May 2022 to May 2025. While in possession of material, nonpublic information concerning Fiserv's true business health, defendant Simons sold 40,000 shares of his personally held Fiserv stock for $8 million in proceeds. Fiserv paid defendant Simons the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2024 | $145,000 | $305,060 | $450,060 |

31.     Defendant Heidi G. Miller ("Miller") was a Fiserv director from July 2019 to May 2025. While in possession of material, nonpublic information concerning Fiserv's true business health, defendant Miller sold 30,000 shares of her personally held Fiserv stock for $6 million in proceeds. Fiserv paid defendant Miller the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2024 | $145,000 | $230,035 | $375,035 |

32.     Defendant Kevin M. Warren ("Warren") was a Fiserv director from October 2020 to January 2026. Defendant Warren was the Chair and a member of Fiserv's Audit Committee from at least April 2024 to at least April 2025. Fiserv paid defendant Warren the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2024 | $152,500 | $230,035 | $382,535 |

33.     The defendants identified in ¶¶19, 20, 21, 29 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶19, 22-24, 26-32 are referred to herein as the

"Director Defendants."  The defendants identified in ¶¶22, 23, 25, 26, 28, 32 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶22, 24, 25, 27-28 are referred to herein as the "Risk Committee Defendants."  The defendants identified in ¶¶21, 29, 30, 31 are referred to herein as the "Insider Selling Defendants."  Collectively, the defendants identified in ¶¶19-32 are referred to herein as the "Individual Defendants."

34.     Non-defendant Gordon M. Nixon has been Fiserv's Chairman of the Board and a director since January 2026.

35.     Non-defendant Gary Shedlin has been a Fiserv director since January 2026.

36.     Non-defendant Celine S. Dufetel has been a Fiserv director since January 2026.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

37.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Fiserv and its shareholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Fiserv in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Fiserv and not in furtherance of their personal interest or benefit.

38.     To discharge their duties, the officers and directors of Fiserv were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Fiserv were required to, among other things:

(a)     disclose material adverse information concerning the transition to Clover, the unsustainable revenue and GPV growth, and the loss of customers to competitors;

(b)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(c)    remain informed as to how Fiserv conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

39.    The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took part in, or substantially, assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and in furtherance of the wrongdoing.

40.    Additionally, the Individual Defendants are required to adhere to the Company's Code of Conduct & Business Ethics (the "Code").  Fiserv's Code states that the Company must "keep accurate business records in ways that are legally compliant and are consistent with our internal controls and policies…. Create accurate, timely and complete records that represent the true state of affairs and nature of activities; never intentionally misrepresent facts, omit material information or otherwise mislead readers[.]"  Under the Code, all employees and directors must "[n]ever create or approve any false, misleading or fraudulent records or cause any other person to do so[.]"  The Code also prohibits insider trading stating, "[i]f you possess material, nonpublic

information about Fiserv or other companies, you may not trade while in possession of the information or share that information with others."

**Breaches of Duties**

41.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Fiserv, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

42.     The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to: (i) engage in insider trading; (ii) repurchase Fiserv stock at artificially inflated prices; and (iii) make materially false and misleading statements, improper practices that wasted the Company's assets, and caused Fiserv to incur substantial damage.

43.     The Individual Defendants, because of their positions of control and authority as officers and directors of Fiserv, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Fiserv has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants and Risk Committee Defendants**

44.     In addition to these duties, under its Charter in effect since June 2023, the Audit Committee Defendants, defendants DiSimone, De Castro, Warren, Yarkoni, Fritz, and Cohen, owed specific duties to Fiserv to assist the Board in overseeing statements concerning the transition

to Clover, the unsustainable revenue and GPV growth, and the loss of customers to competitors. In particular, the Audit Committee's Charter requires the Audit Committee to oversee the Company's financial statements, accounting and financial reporting processes and system of internal controls over financial reporting of the Company and its audits, and the risk management process. Moreover, the Audit Committee's Charter listed additional responsibilities of the Audit Committee, stating:

### Purpose

The primary function of the Audit Committee (the "Committee") is to provide independent **review and oversight of the integrity of the Corporation's accounting and financial reporting processes and financial statements, the system of internal controls** that management and the Board of Directors have established … **the Corporation's compliance with legal and regulatory requirements**…

### Committee Responsibilities

### General

\*      \*      \*

**The Audit Committee shall monitor that the Corporation is complying with law and the Corporation's code of conduct and business ethics**.

**Oversight of Independent Auditor**

\*      \*      \*

The Committee's specific duties include, but are not limited to, the following matters:

\*      \*      \*

    o Monitoring integrated audit results….

    o Reviewing accounting policies and disclosures….

• Review Scope of Services — The Committee shall review with the Chief Audit Executive and the independent auditor the coordination of audit effort to ensure coverage of key business controls and risk areas, reduction of redundant efforts, and the effective use of audit resources.

- 14 -

• Obtain and Review Report from Independent Auditor — The Committee shall obtain a report, at least annually, from the independent auditor describing: the independent auditor's quality control procedures; *any material issues arising from the most recent internal quality control review, peer review, or inquiry or investigation by governmental or professional authorities within the past five years* respecting audits carried out by the independent auditor, and any steps taken to deal with any such issues; and all relationships between the independent auditor and the Corporation.

*     *     *

**Review of Financial Statements and Disclosures**

• <u>Review of Financial Statements</u> — *The Committee shall review and discuss the financial statements and related disclosures with management and the independent auditor, including interim financial statements and annual financial statements, disclosures made in management's discussion and analysis of financial condition and results of operations* and the independent auditor's report with respect to the Corporation's financial statements. *The Committee shall review major issues regarding accounting principles and financial statement presentations*, including any significant changes in the Corporation's selection or application of accounting principles, *and major issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of material control deficiencies*; analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and the effect of regulatory and accounting initiatives, as well as off balance sheet structures on the Corporation's financial statements.

*     *     *

• <u>Review of Disclosures</u> — The Committee shall *review the disclosures made by the Corporation's CEO and CFO during their certification process for the Form 10-K and Form 10-Q regarding any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting or any fraud, whether or not material*, involving management or other employees who have a significant role in the Corporation's internal control over financial reporting.

• <u>Recommendations</u> — *The Committee shall recommend to the Board of Directors whether the audited financial statements should be included in the Annual Report on Form 10-K.*

• <u>Earnings Releases and Other Significant Disclosures</u> — ***The Committee shall discuss with management the Corporation's earnings press releases, including the use of non-GAAP information, the Corporation's earnings guidance, and other significant disclosures***, such as the Corporation's corporate social responsibility report.

*       *       *

**Review of Internal Reports and Processes**

• <u>Review and Oversight of Risks</u> — ***The Committee shall oversee, and inquire of management, the Chief Audit Executive, and the independent auditor about, financial risks and financial reporting matters*** (including tax, accounting, disclosure controls and procedures, and internal control over financial reporting). In this regard, ***the Committee shall annually review, jointly with the Risk Committee, the Enterprise Risk Management program of the Corporation including the identification of top risks***. The Committee chairperson may consult with the chairperson of any other Board committee, including the Risk Committee, to organize and conduct joint meetings on topics that are of common interest.

• <u>Oversight of Corporation's Internal Control Process</u> — ***The Committee shall monitor the Corporation's significant internal control process, including: the process of preparing the interim and annual financial results; disclosure controls and procedures; corporate audit function; and periodic review and approval of the code of conduct and business ethics***….

• <u>Review Legal, Regulatory and Compliance Issues</u> — ***The Committee shall review and consider legal and regulatory matters that may have a material impact on the Corporation's financial statements;*** material litigation matters; reports of evidence of material violations of the law or the Corporation's code of conduct and business ethics; and fraud….

45.     While the Audit Committee Defendants had clear responsibilities with respect to ensuring that there were controls regarding the accuracy of the Company's financial disclosures and the Company's communication with the public, the Audit Committee Defendants failed to fulfill these responsibilities.  In fact, the Audit Committee Defendants have gravely harmed the Company by taking part in the publishing of false and misleading statements and omissions of material fact described herein.

46.     In addition, the Risk Committee Defendants, defendants DiSimone, Mamilli Yarkoni, Gopal, and Cohen owed specific duties to Fiserv to assist the Board in overseeing risk. Specifically, the Risk Committee Charter requires the Risk Committee Defendants to "implement an effective enterprise risk management framework reasonably designed to identify, assess and manage the strategic, operational and reputational risks of the Corporation." Further, the Charter requires the Risk Committee Defendants to "Review risk factors and other disclosures regarding risks contained in reports filed with the Securities and Exchange Commission, including in Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q[.]" While the Risk Committee Defendants had clear responsibilities with respect to ensuring that there were mitigations regarding the adverse outcomes from forcefully migrating customers onto Clover and making materially false and misleading statements concerning the migration and fallout from the Clover transition, the Risk Committee Defendants failed to fulfill these responsibilities. In fact, the Risk Committee Defendants have gravely harmed the Company by taking part in the publishing of false and misleading statements and omissions of material fact described herein that posed the material risks the Company was facing as hypothetical.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

47.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

48.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing

public, including shareholders of Fiserv, regarding the Individual Defendants' management of Fiserv's operations, including the Clover transition and true source of the unsustainable revenue growth; (ii) facilitate the Insider Selling Defendants' illicit sale of over $44.2 million of their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Fiserv and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

49. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the unsustainability of revenue growth and the loss of customers to competitors because of Clover's high prices.

50. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly force customers to migrate to Clover and issue materially false and misleading statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

51. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FISERV TRANSITIONS ITS CUSTOMERS TO CLOVER WHICH CREATES UNSUSTAINABLE REVENUE GROWTH

52. Fiserv operates through two primary business segments: (1) Merchant Solutions, which includes the Clover platform; and (2) Financial Solutions, which encompasses account processing, digital banking, card issuer processing, and network services for banks and other financial institutions. In the Merchant Solutions segment, Fiserv generates revenue from payment processing fees, hardware sales, and subscription-based value-added services (VAS) such as fraud prevention, loyalty programs, and data analytics for a broad range of merchants—from small businesses to large enterprises. In the Financial Solutions segment, revenue derives from long-term contracts with financial institutions for account processing and digital banking platforms, as well as card issuer services.

53. In December 2012, First Data, a leading payment processing firm, acquired the mobile payments startup Clover Network, Inc. Fiserv subsequently acquired First Data in July 2019 in an all-stock transaction valued at $22 billion. The Company promoted the transaction as a strategic, value-enhancing acquisition that would strengthen its position in the payments industry by combining Fiserv's core banking capabilities with First Data's merchant technology through Clover.

54. Clover is Fiserv's flagship product and principal growth engine. Clover is a cloud-based POS platform that enables the secure processing of credit, debit, and mobile payments. Clover primarily earns revenue by charging a percentage fee on each merchant transaction, supplemented by hardware sales and subscription-based VAS offerings.

- 19 -

55.     Clover's GPV serves as a key indicator of transaction volume and the scale of payments processed on the platform.  Rising GPV reflects increased merchant adoption and underpins recurring revenue growth.  Conversely, declines in merchant acquisition or attrition to competitors cause GPV growth to slow.  Because Clover's GPV and merchant retention directly influence Fiserv's long-term revenue sustainability, both metrics are closely monitored by the Individual Defendants and investors.

56.     Before Clover, Fiserv had an older payment gateway for small business merchants, Payeezy.  Payeezy, which provided merchants basic e-commerce functions, was cheaper than Clover and appealed to more cost-conscious businesses.  By mid-2023, Fiserv began phasing out its Payeezy payment system and migrating up to 200,000 Payeezy merchant locations to the Clover platform.

57.     At an investor conference in November 2023, defendant Bisignano outlined Fiserv's strategy to accelerate Clover's long-term revenue growth, emphasizing expansion of its direct sales force and increased VAS revenue through product innovation.  During the same presentation, Fiserv announced a $10 billion revenue target for its Merchant Solutions segment by 2025, including at least $3.5 billion from Clover—excluding any significant contribution from legacy merchant conversions, the back book.  The Company further projected $4.5 billion in Clover revenue for 2026.  Following these statements, investors and analysts increasingly focused on Fiserv's ability to sustain Clover's GPV growth, viewing it as a proxy for long-term, recurring revenue potential.

58.     In April 2024, Fiserv reported that Clover revenue grew 30% year-over-year in the first quarter of 2024, while Clover GPV increased 19% over the same period.  The Individual Defendants attributed the difference between these growth rates to greater adoption of value-added

services among existing clients, channel mix shifts, and pricing adjustments. However, the Individual Defendants failed to acknowledge that the spread also reflected dissatisfaction among former Payeezy merchants, who had been transitioned to Clover but found its higher costs and additional features unnecessary for their businesses. Instead of disclosing that Payeezy merchants were dissatisfied with Clover and flocking to competitors, which meant that the revenue growth was unsustainable, the Individual Defendants made materially false and misleading statements assuring investors that the growth was sustainable.

**IMPROPER STATEMENTS**

59. From July 24, 2024, through July 23, 2025, the Individual Defendants misled investors by artificially inflating Fiserv's growth numbers through compelled migration of legacy customers using Payeezy to Clover, its expensive and feature-heavy POS platform. As this forced migration increased Fiserv's headline growth numbers, Individual Defendants falsely claimed that this growth was being driven by new customers organically signing up for Clover. Unfortunately, that was not the case.

60. On July 24, 2024, Fiserv issued a press release announcing its results for the second quarter ended June 30, 2024 (the "Q2 2024 Earnings Release"). In the Q2 2024 Earnings Release, Fiserv touted its 28% revenue growth in the Merchant Solutions segment. In an investor presentation accompanying the Q2 2024 Earnings Press Release, Fiserv also highlighted "$313 billion Clover annualized GPV, up 17%[.]"

61. On the same day that the Q2 2024 Earnings Release was issued, the Company hosted an earnings call (the "Q2 2024 Call"). During the call, defendant Hau touted revenue growth without disclosing that it was substantially due to forced migrations of customers which were leaving for cheaper competitors:

*Clover revenue grew 28% in the second quarter on an annualized payment volume growth of 17%. The spread between revenue and volume growth continues to reflect a higher penetration of value-added solutions, continued channel mix shift, and value-based pricing.*

VAS penetration stayed constant sequentially at 20% in Q2, an improvement from prior years where we typically see a seasonal decline from Q1 to Q2. VAS penetration was driven by growth in Clover Capital and the Clover SaaS package and should expand with several new offerings coming in the second half.

*Overall, we remain on pace to meet our 2026 targets.*

62. During the Q2 2024 Call, defendant Bisignano was asked about Fiserv's back book conversions. In response, defendant Bisignano discussed how well the new features on the Clover platform were performing without disclosing that it was causing smaller merchants to seek more competitive offers:

**James Euege Faucette**
*Morgan Stanley, Research Division*

I want to go back to Clover and Clover growth. And one of the questions we get a lot is, you talked at your analyst meeting back in November about using Clover and how the back book could contribute a little bit more going forward to that growth. But I'm wondering if you can talk through a little bit the sales cycle there and where your existing customers see value on Clover and how you're feeling about that from a -- and maintaining those customers from a competitive standpoint if they are reevaluating solutions, et cetera?

[Defendant Bisignano:]

Thank you. Thanks, Jim. Good to hear from you. I mean like we've been really, really feeling good about the Clover strategy and continuing to refine it. Obviously, we know there will be a day where we're to come back and say we're headed directly into the back book, but we see so much front book activity opportunity between our international, between our ISV, between how we're thinking about the verticals, like services, like restaurants, that we're continuing to build that product set, that vast.

Obviously, it's an outperformer in attrition across the total book. And we have the benefit of looking at attrition rates from everything. We look at it from what ISO portfolios are trading versus our ISV portfolios trading versus our agent versus our direct book. And *we feel really, really good about how it's performed.*

*We're continuing to ramp up our investment in value-added services and vertical expertise there. So, we've made a set of commitments 3, 5 and then 4, 5 and rates and we think about the Merchant business being $10 billion and $12 billion, and all of that feels really, really tight and on track.*

Obviously, I always have to say we started Clover with seven engineers and three patents and now we've got a global franchise. So, it's straight in our sights. Obviously, we have lots of other great things in our portfolio. But it also is the key to why we have 900 financial institutions.

And I would expect over a period of time on this journey that if you ask me, we haven't ever made a commitment or guided how many financial institution, but *you should expect us to continue to grow that at a double-digit number every year*....

63. The following day, the Company filed a quarterly report on Form 10-Q reporting the Company's financial results for the second quarter of 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-Q stated that "Additional information about market risks to which we are exposed is included within Item 7A of our Annual Report on Form 10-K for the year ended December 31, 2023" (the "2023 Form 10-K"). The Q2 2024 10-Q further stated that "[t]here were no significant changes to our quantitative and qualitative analyses about market risk during the six months ended June 30, 2024." The 2023 Form 10-K contained the following risk factor concerning the competitive and technological challenges that could impact Fiserv's payment solutions, including Clover, and the ability of Fiserv to remain competitive:

*We operate in a competitive business environment and may not be able to compete effectively.*

The markets for our products and services are highly competitive from new and existing competitors. Our principal competitors include other vendors and providers of financial services technology and payment systems, data processing affiliates of large companies, processing centers owned or operated as user cooperatives, financial institutions, independent sales organizations ("ISOs"), independent software vendors, payments companies and payment network operators. Our competitors vary in size and in the scope and breadth of the services they offer. Many of our larger existing and potential clients have historically developed their key applications in-house. As a result, we may compete against our existing or potential clients' in-house capabilities. In addition, we expect that the markets in which we compete will continue to attract new technologies and well-funded competitors, including large technology, telecommunication, media

and other companies not historically in the financial services and payments industries, start-ups and international providers of products and services similar to ours.… We cannot provide any assurance that we will be able to compete successfully against current or future competitors or that competitive pressures faced by us in the markets in which we operate will not materially and adversely affect our business, results of operations and financial condition.

***If we fail to keep pace with technological change, including as a result of artificial intelligence, we could lose clients or have trouble attracting new clients, and our ability to grow may be limited***.

The markets for our products and services are characterized by constant and rapid technological change, evolving industry standards, frequent introduction of new products and services, and increasing client expectations. Our ability to respond timely to these changes, including by enhancing our current products and services and developing and introducing new products and services, will significantly affect our future success. In addition, the success of certain of our products and services rely, in part, on financial institutions, business partners and other third parties promoting the use of or distributing our products and services. If we are unsuccessful in developing, marketing and selling products or services that gain market acceptance, or if third parties insufficiently promote or distribute our products and services, it would likely have a material adverse effect on our ability to retain existing clients, to attract new ones and to grow profitably.

64. The 2023 Form 10-K also contained a risk factor concerning the loss of Fiserv's customers. In particular, the 2023 Form 10-K stated:

***If we are unable to renew contracts on favorable terms or if contracts are terminated prematurely, we could lose clients and our results of operations and financial condition may be adversely affected***.

Failure to achieve favorable renewals of client contracts could negatively impact our business. At the end of the contract term, clients have the opportunity to renegotiate their contracts with us or to consider whether to engage one or more of our competitors to provide products and services or to perform the services in-house. Some of our competitors may offer more attractive prices, features or other services that we do not offer, and some clients may desire to perform the services themselves. Larger clients may be able to seek lower prices from us when they renew or extend a contract or the client's business has significant volume changes. In addition, larger clients may reduce the services we provide if they decide to move services in-house. Further, our small merchant business clients may seek reduced fees due to pricing competition, their own financial condition or pressure from their customers.

We also have contracts with U.S. federal, state and local governments. The contracts with these clients may contain terms that are not typical for non-

government clients, such as the right to terminate for convenience, the right to unilaterally modify or reduce work to be provided under the contract, significant or unlimited indemnification obligations and being subject to appropriation of funds for the government contract program.  In addition, if any of our government contracts were to be terminated for default, we could be suspended or debarred from contracting with that entity in the future, which could also provide other government clients the right to terminate.

These factors could result in lower revenue from a client than we had anticipated based on our agreement with that client.  If we are not successful in achieving high contract renewal rates and favorable contract terms, if contracts are terminated, or if we are prevented from performing work for these clients in the future, our results of operations and financial condition may be materially and adversely affected.

65. The above disclosures treated the material loss of clients as hypothetical.  The Individual Defendants failed to disclose that it was happening and instead issued statements making it seem like it could happen.

66. On October 22, 2024, Fiserv issued a press release announcing its results for the third quarter ended September 30, 2024 (the "Q3 2024 Earnings Release").  In the Q3 2024 Earnings Release, the Company touted its 24% organic revenue growth in the Merchant Solutions segment.  In an investor presentation accompanying the Q3 2024 Earnings Release, Fiserv also highlighted "***$311 billion Clover annualized GPV, up 15%***[.]"

67. On the same day as the Q3 2024 Earnings Release was issued, the Company hosted an earnings call (the "Q3 2024 Call").  In introductory remarks during the Q3 2024 Call, defendant Bisignano touted the revenue growth without disclosing that it was unsustainable and, in fact, falsely claimed that it would continue:

Let me share some of the many highlights of the quarter. ***It was another strong quarter of growth in the Merchant Solutions segment, with organic revenue up 24%. At Clover, revenue grew 28%,*** and value-added services penetration reached 21%, up 1 percentage point from Q2.

*     *     *

As I look across all the new initiatives we are rolling out, I am pleased with how the vision and investment *we put into motion 5 years ago has brought Fiserv to a strong position* today, one that's clearly hard to replicate.

The results show that we are executing on mandates for each of our 2 ecosystem, merchants and financial institutions. ***This will continue in many ways, as we add to our corporate portfolio, extend services to enterprise merchants, expand issuing to new verticals and geographies, enable more real-time payments, modernize core banking systems, add partners, grow internationally, and continue to use distribution data and more***.

68.  During the call, defendant Hau assured investors that the Company remained on track to achieve $4.5 billion in revenue from Clover.  In particular, defendant Hau stated:

***Clover revenue grew 28% in the third quarter on an annualized payment volume growth of 15%***. VAS penetration increased sequentially by 1 point to 21% in Q3, driven by growth in Clover Capital and the Clover SaaS package.

In Q4, we will be rolling out new vertical software plans for retail and services. With this progress, ***we remain on track to achieve our 2026 Clover targets of $4.5 billion in revenue*** and VAS penetration of 27%.

69.  In the question-and-answer portion of the Q3 2024 Call, defendant Hau was asked regarding the Company's expectations for Clover revenue and payment volume.  In response, defendant Hau falsely claimed that volume growth remained "good" when, in truth, smaller merchants were leaving because of the expensive new Clover platform:

**Jason Alan Kupferberg**
*BofA Securities, Research Division*

Just a couple of questions on Clover.  I know revenue growth was steady here. Volume growth ticked down a little bit.  Just any thoughts on Q4 expectations for those metrics?

I think the volume comps get a little bit harder, revenue also next quarter.  So just wanted to get a sense of how we should be thinking about near-term trajectory there. I know you've got some new country launches, product launches to support it.

[Defendant Hau:] Yes, Jason. So, yes, ***we continue to see good overall revenue and volume growth out of our Clover solution***.  As you know, we've got a target to be $4.5 billion by 2026.  That gets us where we're needed about a 28% compound growth rate to achieve that, exactly where we were for the quarter. It's where we are on a year-to-date basis.

- 26 -

A key part of that is continuing to add value-added services that ticked up 1 point to 21% of revenue. Overall, **volume remains good**. It obviously isn't as strong as it was last year. Some of that is very strong last year.

So a little bit of a "difficult comp," but also the consumer while still strong, still spending has certainly eased a bit. We saw that last quarter. We saw that continue again this quarter. But **we feel good about where that spending is right now and what we see going into the future.**

70.     In the question-and-answer portion of the Q3 2024 Call, defendant Bisignano was asked about the Company's expectations for its $4.5 billion Clover target. In response, defendant Bisignano did not disclose that the $4.5 billion target was unrealistic because the growth was unsustainable and instead touted Clover's capability:

**James Eugene Faucette**
*Morgan Stanley , Research Division*

I wanted to follow up on the SMB bundle, and this ties a little bit into Dan's question, but it seems like there's a lot of capability expansion that's happening within the Clover ecosystem and then looking at new ways to go to market.

How should we be thinking about -- I know you gave some targets for back book and some of those things to get to the $4.5 billion target. But how should we be thinking about like the roles that those will play and if there's been any change in your thinking in terms of mix or type of customers and sets within that Clover target?

[Defendant Bisignano:] Yes. I know, there's only one question allowed, but that's all like five. Good job, James. Let me try it, first of all, in some ways, they're not really inside this company that there's a ton of new thoughts. We always have a lot of R&D going on that historically, and the IR team don't always love me for it, but the more apt to talk to you about when we're getting to market than what's in the R&D shop.

So **this idea about us bringing more capability to the SMB space has always been there**. I think if you go back to our acquisition of Ondot and us embedding it in Mobiliti and then it became let's think about XD and a new product. But then you start saying to yourself, "We could deliver this way beyond Clover and XD. We can integrate it all. We can put our spend labs, acquisition there. Oh, boy, we can end up helping our LFIs grow and other channel partners and future partners to be signed up."

That's why we are ultimately a partner of choice for people who want to partner in the SMB space because of our capability. So I think you got to think about it that,

yes, *there may be more back book swept up in there because there's a reason beyond switching out your FD150 for a Clover Station, now you have a much broader capability*.

None of this back book, if it happened, would ever more than our natural kind of rate, which we talked about of merchant churn going from an older device to a newer. But I think you're seeing the size of the opportunity to actually impact Clover more than we might have because of the full capability set. Thank you. *I think you're on the right track there*.

71. The following day, the Company filed a quarterly report on Form 10-Q reporting the Company's financial results for the third quarter of 2024 (the "Q3 2024 10-Q"). The Q3 2024 10-Q stated that "Additional information about market risks to which we are exposed is included within Item 7A of our [2023 Form 10-K]." The Q3 2024 10-Q further stated that "[t]here were no significant changes to our quantitative and qualitative analyses about market risk during the nine months ended September 30, 2024." The risk disclosures continued to treat the material change in customers as hypothetical.

72. On December 4, 2024, defendant Hau participated in the UBS Global Technology & AI Conference (the "2024 UBS Investor Call"). During the 2024 UBS Investor Call, defendant Hau was asked about Fiserv's non-Clover business. In response, defendant Hau indicated that non-Clover revenue would continue to grow:

**Timothy Edward Chiodo**
*UBS Investment Bank, Research Division*

Excellent. Thank you, Bob. We're going to move on to non-Clover SMB. So in the model, it's roughly $3.7 billion or so of revenue last year. We understand about 2/3 of that or so is in the U.S. We generally think about that as a fast-growing international business for the roughly 1/3 of it. And then a slower growth or possibly the ex growth U.S. non-Clover SMB. But that's okay, right? There is a plan to address that via back book conversion. That's more of a 2026 event. Can you just talk to us a little bit about what is the makeup of the U.S. non-Clover SMB business?

[Defendant Hau:] Yes. So this is a great business for us. As you say, it's about $3.7 billion out of our almost, call it, $5.8 billion of revenue, almost $6 billion of small business overall revenue. *Clover obviously growing very rapidly.*

*We expect that non-Clover business to generally grow mid-single digits globally. And we continue to sell it. We continue to see growth in existing clients using -- as our small businesses grow, so does our revenue, and we continue to sell it.* Obviously, we believe Clover is a great solution, but it isn't necessarily the solution for our small businesses.

Not every small business needs to have a full blown operating system. Some just like running their small business. The example I love to give is I'm running a pizzeria because I love making pies. I got 5 tabletops. I don't need a fancy full-blown operating system. Having a terminal on my car is more than fine, and we're happy to sell that service to those clients.

73. During the 2024 UBS Investor Call, defendant Hau was asked about Fiserv's $4.5 billion Clover revenue target by 2026. Defendant Hau falsely claimed that increased VAS would allow the Company to hit the 2026 revenue target:

**Timothy Edward Chiodo**
*UBS Investment Bank, Research Division*

We're going to move to the Clover $4.5 billion target by 2026. A question that we often get from investors is the CAGR implied to get there is sort of in the high 20s or so on the revenue growth. And you've had a large gap between the volume growth and the revenue growth because of the strength of the value-added services. So the question we often get is, implied in reaching that target, from here, call it, the mid-teens volume growth for Clover, is there an expectation of a mild acceleration in the volume growth to help support that target?

[Defendant Hau:] Yes. So there's a number of drivers that get us from the roughly just over $2 billion last year to $4.5 billion. If you do the math, that requires about a 28% CAGR. It doesn't mean we're going to grow 28% every day, every month, every quarter, every year. But broadly, *we're looking at a 28% growth to get there.*

*By the way, first half – excuse me, first 9 months of the year, we're at about a 28% growth.* And that's a combination of continued volume, most definitely, not a massive change in volume. We're not counting on a big improvement in the macro economy to get us there, but the economy continues to operate kind of where it is right now. We'll get a lift in volume as we expand internationally.

So that's part of the *growth algorithm is additional volume as we expand internationally, but also selling more value-added services internationally*.

\*     \*     \*

The value-added services, the new capabilities that I talked about in the first question, we continue to invest in bringing new capabilities, but also see further penetration of the existing capability. Part of the growth algorithm to get to that

$4.5 billion is to see our value-added service penetration to go from 19% to 20%, 21%. By 2026, we'll be a 27% value-added service.

So *you'll actually see that spread between volume and revenue growth continue to widen as we see that value-added service penetration continue to grow*. And so that's bringing new capabilities not only to those 3 verticals that I talked about, restaurant, retail and services, but also horizontal capability.

74. On December 10, 2024, defendant Bisignano participated in a Raymond James TMT and Consumer Conference (the "2024 Raymond James Investor Call"). During the 2024 Raymond James Investor Call, defendant Bisignano was asked about Fiserv's back book conversion rate and whether Clover's growth was sustainable. In response, he touted Clover's impact on client creation and deemed it "successful":

**John Kimbrough Davis**
*Raymond James & Associates, Inc. Research Division*

No, just to go back to the merchant business here. So you laid out 12% to 15% organic growth at the Investor Day. Obviously, Clover is a big piece of that, clearly taking share. The industry is probably growing high single digits. So if we just double click on Clover, it's still growing close to 30%. You've laid out a target for $4.5 billion of revenue in '26, which implies kind of high 20s growth from here, mid-teens to high teens volume growth. Just talk a little bit about the sustainability of that growth. What gives you confidence? You mentioned Brazil and Mexico, international rollout. You still haven't done much with the back book. But just help talk a little bit about the success at Clover, and what's driving that a sustained high level of growth into '25 and '26?

[Defendant Bisignano:] Yes. I have a smile on my face because I have an objective here to change our vernacular a little bit. Back book was never my term. It's my client base, right? What am I going to do with my client base? And generally, I'm in my client base trying to sell more product and innovate with them. So -- and so -- here's the way I think about it, because really we're asking -- looks like you can get from here to there, but tell us how you're going to get from here to there.

We have this fabulous distribution systems and acquiring – we're in the sport of acquiring new merchants and selling more products. I don't have really fancy strategies, get more clients and bring more product. And *we've been very successful at that*. So you look at [ pen rate ] going up. And if you think about, call it, circa approximately 1,000 financial institutions and then you see us do something like ADP, right? That's a great partnership. I love Maria Black, the CEO there. We said we should be able to do something together. We put our teams together, and

we came out with us distributing their product and them distributing our product and so [indiscernible], I think.

So you could think about those type of partnerships, then you think of plus or minus 1,000 financial institutions. And I think in all of those, our [ pen ] rate in that installed base that they have can go up. Said differently, if I look at a lot of partnerships, I think we could double the amount of clients in those partnerships that we have. Then secondarily, I think, *we're going to continue to create more partnerships because the reality is, Clover is darn good*. Clover -- financial institution and partners like Clover have ability to put more software. You will get us putting CashFlow Central on Clover. You look at us having payroll through ADP on Clover. Those are all additive in a big way, and then you go outside the U.S. and you also bring it to your other distribution partners.

(Partial alterations in original.)

75.     During the 2024 Raymond James Investor Call, defendant Bisignano was asked about Fiserv's non-Clover revenue growth. Defendant Bisignano responded by claiming that the Company is a "long-term winner":

**John Kimbrough Davis**
*Raymond James & Associates, Inc., Research Division*

And maybe just to touch for a minute on the ex Clover merchant business. You talk a little bit about the success you're having in enterprise kind of other initiatives that are driving pretty healthy growth outside of Clover?

[Defendant Bisignano:] Yes.. Well, I mean, I think look at ultimately, we built Commerce Hub, and we have an orchestration layer and you see us winning now in the enterprise, and we'll call it omni-commerce because a lot of our clients have it going both ways. But we got a solution that we believe can serve omni-commerce better than anybody else in the industry because we're a fabulous in-store, but we're also fabulous at now the ability to give them an orchestration layer deliver more vast into that too and be able to help them grow. So I'd say that there.

I'd also say, we have an unbelievable ISV business, that was the byproduct of 2 acquisitions when we got a couple of dollars back in the day. And BluePay and CardConnect, which one was an e-comm, one was -- had an ISV. We brought it together. We used the technology of that to grow our agent business in a different way. And many of those are not necessarily Clover, but there are these technical integrations.

Now we do see a world where Clover shows up there, too. But right now, that would sit in a non, as you describe it, non-Clover business. So I think *our product set is strong. I think our technical integrations are good. I think we look at*

*everybody we compete with and feel like yes, there's people ahead of us and things, but our ability to invest and our ability to have technical expertise and our client base's desire for us to win, all put together make us a long-term winner*, I believe.

76.     On February 5, 2025, Fiserv issued a press release announcing its results for the fourth quarter and full year ended December 31, 2024 (the "2024 Earnings Release"). In the 2024 Earnings Release, Fiserv touted its 11% revenue growth in the Merchant Solutions segment. In an investor presentation accompanying the 2024 Earnings Release, Fiserv also highlighted "***$310 billion Clover annualized GPV, up 14%[.]***"

77.     Also on February 5, 2025, the Company hosted an earnings call (the "Q4 2024 Call"). In his introductory remarks during the Q4 2024 Call, defendant Bisignano stated that the Company was "winning small business clients":

> ***We added large enterprise clients, both traditional and e-commerce merchants, on the strength of our unified offering, modern gateway and growing value-added solutions portfolio.***
>
> ***At Clover, we laid the foundation for continuing our strong growth*** as we released new software, services and hardware offerings, and added 3 new countries. ***We extended merchant acquiring services to more financial institutions focused on winning small business clients***.
>
> We've built solutions to help SMBs navigate the complexity of running their businesses. Managing cash flow, in particular, is one of the biggest challenges. It's ineffective, time - consuming, and expensive.

78.     During the same call, defendant Hau touted small business growth without disclosing that the growth was only due to forced migrations. In particular, defendant Hau stated:

> Small business organic and adjusted revenue growth in the quarter was 24% and 12%, respectively, on payments volume growth of 4%.
>
> Clover revenue reached $2.7 billion in 2024, with nearly 90% in our small business line reporting. Clover revenue grew 29% in both the quarter and full year on Q4 annualized payment volume growth of 14%. ***This spread reflects growth in value-added solutions, some targeted value-based pricing actions and strong hardware sales***.

79. Defendant Hau further claimed that the strong revenue growth was from Clover and that Clover would drive small business growth. In particular, he stated that:

> Drilling down by segment. For Merchant Solutions, ***we see organic revenue growth of 12% to 15% in 2025, driven mostly by strong growth in Clover*** as we reach our $3.5 billion revenue target, including an increase in VAS penetration to the 25% outlook.
>
> Our ability to achieve these goals is supported by opportunities we advanced in 2024 with 5 new hardware rollouts, new features and functionality for our 3 focused verticals of restaurant, services and retail; and 3 new geographies: Brazil, Mexico and Australia.
>
> ***We expect the small business line to grow above segment average driven by Clover.*** Enterprise should be slightly below the segment average to more normal levels following the end of transitory benefits in Argentina and some onetime revenues associated with the large PayFac win….
>
> While we don't give quarterly guidance, I think it's instructive to consider the quarterly cadence this year. Overall, ***we expect growth to be weighted towards the second half of the year***. Several reasons for this. First, we've had multiple new product rollouts in late 2024 that we expect will gain traction over time in the market from Clover vertical software to CashFlow Central and the SMB suite.
>
> Second, we had several important new wins that will take time to implement and generate revenue, including Target expected to go live in late March and Verizon in September.
>
> Third, we entered 3 new countries with pilots in the fourth quarter, and full-scale go-to-market efforts just getting underway this year.

80. On February 20, 2025, the Company filed an annual report on Form 10-K reporting the Company's financial results for the fourth quarter and full year ended December 31, 2024 (the "2024 Form 10-K"). The 2024 Form 10-K was signed by defendants Bisignano, Hau, Best, De Castro, DiSimone, Fritz, Gopal, Mamilli, Miller, Simons, Warren, and Yarkoni. Although the 2024 Form 10-K contained substantially the same risk disclosures as the 2023 Form 10-K, the 2024 Form 10-K included new disclosures related to artificial intelligence technology as well as an additional paragraph: "In addition, participants in the financial services, payments and technology industries ***may*** merge, create joint ventures or engage in other business combinations,

alliances and consolidations that may strengthen their existing products and services or create new products and services that compete with ours." This hypothetical situation was already occurring and skirted around the truth—competitors were taking Fiserv's customers because competitor pricing was better than Clover for small businesses.

81. On March 11, 2025, defendant Hau participated in the Wolfe Research FinTech Forum (the "2025 Wolfe Research Investor Call"). During the 2025 Wolfe Research Investor Call, defendant Hau was asked about Fiserv's growth prospects. In response, he claimed that the Company would see more growth in the second half of the year:

> From a Fiserv standpoint, obviously, macro matters but *we see good growth*. When we gave the guide for the year, we guided organic growth for the company at 10% to 12%. But we also did upfront, and this is not a macro environment per se. This was original guidance back in early February with our fourth quarter, that *we expect the growth to ramp into the second half of the year, and we continue to see that. And that's really driven by things like CashFlow Central coming into market, the new partnerships we have with ADP where we're selling each other products, payroll through the Clover solutions, selling payroll, them selling Clover*. Things like some of the new products and new software that got rolled out last year continue to accelerate.

82. During the 2025 Wolfe Research Investor Call, defendant Hau was also asked about Clover's growth prospects. Defendant Hau responded by touting Clover's growth and claimed that the Company had good visibility into future growth that would continue:

> **Darrin David Peller**
> *Wolfe Research, LLC*
>
> And Clover again, I mean in terms of the trajectory you expect for the year, it's just – look, it's coming off of a really strong year. So thinking about comps and just thinking about trajectory going forward?
>
> [Defendant Hau:] Yes. So in March of 2022, we laid out our goal for Clover revenue in 2025. So March of 2022, we said we expect to be $3.5 billion of revenue at the end of 2025, and that was about a 28% to 30% compound annual growth rate to achieve that. Some of you in this room might have thought we were a little bit crazy in laying that goal out. But fast forward now, the last couple of years, we've seen 28%, 29% growth. We closed out last year at 2 -- 2024 at $2.7 billion. And to achieve that $3.5 billion, we need to continue that 29% growth. And that is the

outcome or the benefit of that international expansion that new products, both in terms of hardware and software, continuing to build out our distribution channel.

**We have good visibility into the Clover growth confidence in that international channel**.

*     *     *

**Darrin David Peller**
*Wolfe Research, LLC*

And then just one question we get a lot is the back book, right, whether or not you're actually really benefiting from Clover's growth from just converting business over from your existing business. Where are you on that in terms of whether it's a percent number or anything else you can give us?

[Defendant Hau:] Yes. So that dialogue has shifted over the last several years, *4 or 5 years ago, that we got the question around the back book from the standpoint of, well, yes, great, you're growing Clover, but it's all back book conversion, so it's not real. And back then, the answer is no. Actually, that Clover revenue is actually driven by new clients to Fiserv. And about 10% of the Clover growth back then was from back book conversion. So yes, we do have merchant clients who are not using Clover convert to Clover, and it provides about a 10% lift*.

Fast forward today, the question is more of, geez, when are you going to go attack that back book and provide even more growth? Today, **we're about 10% of our growth comes from back book**. And that's a combination of merchants deciding to move from a "simple dumb terminal" on their counter to wanting a full-blown operating system and seeing the value, the benefit of having all of those value-added solutions embedded in the extra data and information they can get by running Clover and increase the efficiency of their operation, so deciding to convert. It's also some sales activity. But for the most part, *our effort is around bringing on new clients and continuing to expand the number of merchants, small businesses that are using our solutions and growing that way*.

83.     On March 18, 2025, defendant Hau participated in the Bank of America Electronic Payments Symposium (the "2025 Bank of America Investor Call"). During the call, defendant Hau was asked about Fiserv's "back book" volume. Defendant Hau downplayed the amount of customers that were forced to migrate to a more complex and more expensive system, Clover, which would cause the customers to run to Fiserv's competitors:

**Jason Alan Kupferberg**
*BofA Securities, Research Division*

Okay. Yes. Makes sense. Makes sense. So the back book also comes up sometimes as a Clover driver and I think originally, at the Investor Day, you guys had said, that back book maybe contributes 10%. And I think that's more or less been your experience since the time of the Investor Day. As we look out at your 2026 target, does that 10% get a little bit bigger?

[Defendant Hau:] Yes. *So the 10% you were referring to is a number actually we've been seeing for several years.* I can tell you for the last 5 years that I've been associated with the merchant side of our business. That's been the case. And what that is, is *roughly 10% of the Clover growth is driven by back book conversion, or said another way, 90% of new Clover revenue growth is from clients that are new to Fiserv from a merchant acquiring standpoint. And that's been very consistent for the last 5 years.*

I would expect that to kind of hang in there. *That's what we're seeing right now, and I expect to see the balance of this year. What we said during Investor Day back in November is as we hit 2026, 2027, '28, we'd expect that to modify a little bit.* It's not something that we don't need that to go to 50% to get to the $4.5 billion. But at some point in time, it would make sense to more proactively address that back book and November of '23, '26 look like a time that we probably want to do that.

84. The above statements were materially false and misleading because they failed to disclose that: (i) due to cost issues and other problems with its Payeezy platform, Fiserv forced Payeezy merchants to convert to its Clover platform; (ii) Clover's revenue growth and GPV growth were temporarily boosted by these conversions, which concealed a slowdown in new merchant business; (iii) shortly after these conversions, a significant portion of former Payeezy merchants switched to Fiserv's competitors due to Clover's pricing, among other issues; and (iv) as a result of these merchant losses, Clover's GPV growth was significantly slowing, and its revenue growth was unsustainable. The truth emerged, as discussed below, over several disclosures with increasingly worse results.

## THE TRUTH EMERGES OVER SEVERAL DISCLOSURES

85.     Investors began to learn the truth about this fraud on April 24, 2025, when Fiserv held an earnings call in connection with its financial results for the first quarter of 2025, the Q1 2025 Call.  During the Q1 2025 Call, Fiserv reported a material decline from 2024 GPV growth rates of between 14% and 17%, down to 8% for the first quarter of 2025, despite Clover's revenue growth remaining relatively flat for the quarter.  Defendant Hau attributed this spread between Clover revenue growth and GPV growth to strong one-time Clover hardware sales and VAS penetration within existing merchants, among other things:

> Clover revenue growth was a solid 27% against the highest growth quarter last year. There are several reasons for the spread between revenue and volume growth including a 2-point gain sequentially in the penetration rate of Clover value-added services to 24%.  Roughly 1/3 of the spread came from strong Clover hardware sales.  As Mike mentioned, banks in particular added Clover hardware as part of a strategic focus to address the SMB acquiring market.  Such sales bode well for our processing and VAS revenue going forward. Another nearly 1/3 came from growth in anticipation and Clover Capital.  As we added more Clover merchants in Argentina late last year, their anticipation revenue is now ramping in Clover VAS, and we continue to see overall strength in other Clover VAS as well.

86.     Analysts and investors were shocked.  J.P. Morgan flagged "the widest spread between revenue and volume in our model's history, ***raising concerns about sustainability of premium growth***."

87.     On this news, Fiserv's market capitalization plunged 18.5%, or $40.20 per share, on April 24, 2025, to close at $176.90 per share compared to the previous trading day's closing of $217.10 per share, erasing almost $22.2 billion in market capitalization in a single day.

88.     Although this news partially revealed the truth, the Individual Defendants continued to mislead investors by failing to disclose that the spread between GPV growth and Clover revenue was largely due to the loss of transaction volumes from a substantial number of

former Payeezy merchants who cancelled their Clover contracts. During the Q1 2025 Call, defendant Lyons made the following statements about Clover revenue and GPV growth:

> Let's shift to our performance at the segment level. Merchant Solutions posted 8% organic revenue growth with a 10 basis point rise in adjusted operating margin to 34.2%. Bob will discuss the details, so I'd like to highlight our progress in the quarter on 3 key near-term initiatives.
>
> First is ***driving Clover growth through new products, new markets, new partners and new geographies***. Second is signing more financial institutions as merchant referral partners. And the third is adding new and existing enterprise merchant clients to our Commerce Hub platform and driving VAS penetration.

89. On the Q1 2025 Call, defendant Hau made a statement about Clover's decelerating GPV growth. In particular, defendant Hau claimed that the spread was due to strong Clover growth:

> For Clover, revenue grew 27% in the first quarter and annualized payment volume growth of 8%. ***The softer volume growth largely reflects 3 factors: first, leap year and Easter, as I just mentioned. Second, a difficult comparison against the gateway conversion that brought new merchants to Clover in Q1 '24. And third, a slowdown in spending in Canada, particularly on travel***. Canada is currently the largest international market for Clover. Excluding these specific factors, Clover volume grew at a healthy double-digit pace.
>
> Clover revenue growth was a solid 27% against the highest growth quarter last year. ***There are several reasons for the spread between revenue and volume growth including a 2-point gain sequentially in the penetration rate of Clover value-added services to 24%. Roughly 1/3 of the spread came from strong Clover hardware sales***. As Mike mentioned, banks in particular added Clover hardware as part of a strategic focus to address the SMB acquiring market. Such sales bode well for our Processing and VAS revenue going forward. Another nearly 1/3 came from growth in anticipation and Clover capital. As we added more Clover merchants in Argentina late last year, their anticipation revenue is now ramping in Clover VAS, and we continue to see overall strength in other Clover VAS as well.

90. On April 25, 2025, the Company filed a quarterly report on Form 10-Q reporting the Company's financial and operational results for the first quarter of 2025 (the "Q1 2025 10-Q"). The Q1 2025 10-Q stated that "Additional information about market risks to which we are exposed is included within Item 7A of our [2024 Form 10-K]." The Q1 2025 10-Q further stated that

"[t]here were no significant changes to our quantitative and qualitative analyses about market risk during the three months ended March 31, 2025."  The 2024 Form 10-K contained the risk disclosures which treated customers leaving for competitors as hypothetical.

91.    The truth continued to emerge on May 15, 2025.  That day, Fiserv disappointed investors by disclosing that Clover's GPV growth deceleration would continue throughout 2025. During the J.P. Morgan Global Technology, Media and Communications Conference, defendant Hau was asked about investors' "hard stock reaction" to the Company's reports of decelerating volume growth:

**Tien-Tsin Huang**
*JPMorgan Chase & Co, Research Division*

Yes. I know you've been really busy with a lot of things going on. But I figured we'd just start -- just given the hard stock reaction to the first quarter, give you an opportunity to address that, what might be understood? What's been the learning from that in terms of the questions you've been receiving?

[Defendant Hau:] Yes. So, maybe obvious, but I'll state the obvious. Certainly disappointed with the reaction, unexpected.  And what we have learned through this is *there is an intense focus on Clover volume*.  So over and over and over again, as we've talked to investors since that earnings call, it comes back to what's going on with Clover volume.  They get the revenue, they get the rest of the company, but what's happening there.

And so lots of conversations about kind of all the puts and takes in that number. And specifically, as I suspect most of you know, *we reported an 8% Clover volume growth, which was slower than what we reported last year. Lots of conversation about the sequential move of that*.  Fourth quarter of last year, we reported 14%. And so, when you look at it sequentially, it looks like a 6-point drop.

And there were a couple of things that we talked about on the earnings call and extensively since. And 2 very specific things.  One is last year, particularly in the first quarter of last year, we had a gateway conversion.  So we had a gateway that was non-Clover clients that we converted over to the Clover Gateway.  And so *we saw a pickup of volume from that last year that doesn't repeat this year*.  And so that was about 2 points of headwind against the growth rate.

So 8% kind of becomes 10%. The other item we talked about is, obviously, Q1 last year, we had leap year, 1 day out of 91 days last year, 90 days this year.  That's a little more than 1 point of growth. So 8% becomes 10% becomes 11%.  And then

we had a couple of other items we talked about, the timing of Easter was Q1 of last year, Q2 of this year, March to April. We did see some slowing of Canada, which is our largest international market in the first quarter.

Fast forward to today, right now, and I don't give quarterly guidance period, let alone on one key performance indicator around Clover. But *given the lots of discussion and questions around it, we expect second quarter to be generally similar to first quarter in terms of the reported growth rate from a volume standpoint.*

*We do see that gateway headwind actually increasing a bit in the second quarter*. And that's a dynamic of during the first quarter, we've been converting that gateway for about a year [indiscernible] probably about 2 quarters heading into first quarter, got a big chunk in the first quarter and then a little bit more in second and third quarter, but *it was ramping through the first quarter. So Q2 is when you have the full quarter impact of what was going on in Q1. And then we expect that to subside going forward, Q3 and Q4*.

92. Analysts and investors were surprised by the news. Wolfe Research noted the higher Clover attrition rate:

*The primary drag on Clover's growth in Q1 and Q2 has been the migration of Payeezy gateway merchants onto Clover throughout FY24.* While this initiative boosted volumes in the 1H'24, it was partially offset by higher attrition in the second half. Q1 2025 Clover volume growth decelerated by roughly 200bps and is expected to have a ~300bps impact in Q2, as the Y/Y benefit laps (the migration process peaked with the discontinuation of Payeezy onboarding on March 25, 2024), coupled with attrition of the Payeezy conversion base.

\*     \*     \*

Management noted that attrition from these migrated merchants *began relatively quickly, driven largely by price-sensitive clients seeking lower-cost alternatives (as these merchants weren't typically utilizing FI's VAS offerings).* This attrition partially offset some volume growth in Q3 and Q4 2024, but sets up easier Y/Y comparisons in the back half of 2025.

93. On this news, Fiserv's market capitalization plunged 16.2%, or $30.73 per share, on May 15, 2025, to close at $159.13 per share compared to the previous trading day's closing of $189.86 per share, erasing over $17 billion in market capitalization in a single day.

94.     On May 20, 2025, defendant Hau participated in the Barclays Emerging Payments and FinTech Forum (the "2025 Barclays Investor Call").  During the call, defendant Hau admitted that Fiserv had "significant" price and operational impact with its legacy Payeezy gateway:

> I certainly recognize that the reported GPV for the first quarter and our outlook for the second quarter, 8%, was a surprise or a disappointment. But particularly if you factor in the impact of the gateway that we've talked about extensively in the last 3 weeks, right in line with our expectations as we entered this year, right in line with where we believe the year is going.  We've talked a lot about ex gateway, low double digits in the first quarter and in the second quarter.  That's our expectation, to deliver that $3.5 billion, and we feel good about our ability to do that.
>
> Just a little bit of background on that gateway, because I think there's been some misunderstanding about what that is and why we did it.  This is a third-party gateway that we resold over the last several years. And we found ourselves a couple of years ago being a very large part of a third party from a revenue standpoint, and ***we started to see some significant price impact and operational impact***.  So we made the decision a couple of years ago or so to exit that gateway.  And when you make that decision, you want to move all of those merchants to a new gateway. And obviously, the right choice for us is our go-forward gateway, Clover. So we went through that process. It wasn't about driving additional volume or revenue to Clover, it was about operational efficiency, cost savings and getting folks to the appropriate gateway.  We did that. We started it late 2023, really accelerated. The peak amount of movement was in first quarter of '24. So you see that impact now as that business kind of laps itself, so to speak.

95.     On June 4, 2025, defendant Hau participated in the William Blair Growth Stock Conference (the "2025 William Blair Investor Call").  During the call, defendant Hau disclosed that Fiserv's legacy Payeezy gateway had become "quite costly and a bit problematic":

> And we've talked extensively about the gateway conversion that we did in 2024 -- late '23, early '24, that caused about a 2-point headwind on that 8 points.  So that 8%, if you adjust for the gateway, low double-digits, consistent with what we saw last year.  And that gateway conversion really didn't bring much revenue. It was a strategy to eliminate ***one gateway that we had in the company, was a third-party gateway that we were white labeling that became quite costly and a bit problematic***.  And so we made the decision to move away from that gateway. And once you make that decision to leave a gateway, you've got to figure out where you're going to move those clients.  Obviously, Clover is our go-forward gateway. And so we move clients to the Clover.  That drove some volume last year that ebbed in the first quarter of this year.  So again, if you adjust, we're at low double-digits, right in line with what we expected and right in line with what we need to deliver the $3.5 billion for this year.

96.     During the 2025 William Blair Investor Call, defendant Hau was asked about the Company's outlook for organic revenue growth. In particular, defendant Haue claimed that the Company would grow 10% 12% during 2025:

**Andrew W. Jeffrey**
*William Blair & Company L.L.C., Research Division*

So we just have a couple more minutes. Maybe if you could just offer a high-level medium-term outlook for organic revenue growth, EBIT margin expansion, EPS growth. Mentioning that should be the 40th consecutive year of double-digit EPS growth, which is no small feat. I guess you get credit for about 1/4 of that. And maybe capital allocation.

[Defendant Hau:] Yes. So we talked a little bit, ***we expect the – excuse me, the total company to grow 10% to 12% this year. This will be the fourth year in a row of 11% or better growth if we hit the midpoint of that. So, we've been in double digits for the last several years. For the company, that's quite an acceleration***.

97.     The statements made in the Q1 2025 Call, Q1 2025 10-Q, and 2025 William Blair Investor Call were materially false and misleading because they failed to disclose that: (i) due to cost issues and other problems with its Payeezy platform, Fiserv forced Payeezy merchants to convert to its Clover platform; (ii) Clover's revenue growth and GPV growth were temporarily boosted by these conversions, which concealed a slowdown in new merchant business; (iii) shortly after these conversions, a significant portion of former Payeezy merchants switched to competitors because of Clover's pricing, among other issues; and (iv) as a result of these merchant losses, Clover's GPV growth was significantly slowing, and its revenue growth was unsustainable.

98.     The truth fully emerged on July 23, 2025. That day, Fiserv released its results for the second quarter of 2025. The Company lowered the top end of its full-year organic growth guidance range and reported that its quarterly organic revenue in the Merchant segment had decelerated to 9% year-over-year from 11% in the previous quarter. During the conference call to discuss second quarter of 2025 results, defendant Lyons stated, "[j]ust on the overall organic growth rate for the company, we obviously refined to approximately 10% from 10% to 12%."

99. In response, analysts questioned the credibility of Fiserv's previous growth metrics. For instance, Wolfe research stated that "we recognize a need for the dust to settle, with stability/credibility in metrics and guidance reestablished before some investors add materially to shares."

100. On this news, Fiserv's market capitalization fell for two days by 15.6%, or $25.90 per share. On July 24, 2025, the stock price closed at $140.08 per share compared to July 22, 2025's closing of $165.98 per share, erasing over $14 billion in market capitalization.

## THE DIRECTOR DEFENDANTS CAUSED FISERV TO REPURCHASE ITS OWN STOCK AT ARTIFICIALLY INFLATED PRICES

101. Despite their knowledge, or reckless disregard for, the Company's growth prospects, the Board approved substantial stock repurchases at artificially inflated prices. On February 22, 2023, the Board approved a share repurchase program for up to 75 million shares. On February 19, 2025, the Board approved a new share repurchase program for up to 60 million shares.

102. While the price of Fiserv's stock was inflated due to the false and misleading statements by the Individual Defendants, the Director Defendants caused Fiserv to repurchase 36,482,178 shares of its own common stock for a total of $6.9 billion before the truth fully emerged. Given that the price of Fiserv stock was $140.08 per share after the disclosures on July 23, 2025, the true value of the repurchased shares was roughly $5.1 billion. Accordingly, the Company overpaid $1.8 billion to repurchase these shares.

## INSIDER SALES BY DEFENDANTS BISIGNANO, SIMONS, MILLER, AND BEST

103. Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of Fiserv's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated. As officers and directors of Fiserv,

the Insider Selling Defendants were privy to material, nonpublic information about the Company's true business health. Notably, all of defendants Simons, Miller, and Best's sales were not made pursuant to trading plans.

104. While in possession of material nonpublic information, defendant Bisignano sold 145,000 shares of his personally held Fiserv stock for proceeds of $25.7 million. His sales were timed to maximize profit from Fiserv's then artificially inflated stock price.

105. While in possession of material nonpublic information, defendant Simons sold 40,000 shares of his personally held Fiserv stock for proceeds of $8 million. His sales were timed to maximize profit from Fiserv's then artificially inflated stock price. Defendant Simon's sales are suspicious given that his stock sales represented 34.43% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 116,180 |
| Shares Sold During SP | 40,000 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 116,180 |
| Shares Remaining SP | 76,180 |
| **Total Proceeds from Sales** | **$8,078,800.00** |
| **% of Total Ownership Sold During SP** | **34.43%** |

106. While in possession of material nonpublic information, defendant Miller sold 30,000 shares of her personally held Fiserv stock for proceeds of $6 million. Her sales were timed to maximize profit from Fiserv's then artificially inflated stock price. Defendant Miller's sales are suspicious given that her stock sales represented 47.44% of her holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 63,235 |
| Shares Sold During SP | 30,000 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 63,235 |
| Shares Remaining SP | 33,235 |
| **Total Proceeds from Sales** | **$6,033,842.62** |
| **% of Total Ownership Sold During SP** | **47.44%** |

107.    While in possession of material nonpublic information, defendant Best sold 20,821 shares of his personally held Fiserv stock for proceeds of $5.2 million.  His sales were timed to maximize profit from Fiserv's then artificially inflated stock price.  Defendant Best's sales are suspicious given that his stock sales represented 32.71% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 38,771 |
| Shares Sold During SP | 20,821 |
| Shares Disposed (Other) During SP | 3,940 |
| Total Shares Held During SP | 63,657 |
| Shares Remaining SP | 38,896 |
| **Total Proceeds from Sales** | **$5,226,287.89** |
| **% of Total Ownership Sold During SP** | **32.71%** |

108.    In sum, the Insider Selling Defendants sold over $44.2 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **BISIGNANO**[3] | 9/20/2024 | 33,248 | $176.64 | $5,872,926.72 |
| **Former Chief Executive Officer & Chairman** | 9/20/2024 | 111,452 | $177.58 | $19,791,646.16 |
| | 9/20/2024 | 300 | $178.21 | $53,463.00 |
| | **Total:** | **145,000** | | **$25,718,035.88** |
| | | | | |
| **SIMONS Current Chairman** | 10/23/2024 | 40,000 | $201.97 | $8,078,800.00 |
| | **Total:** | **40,000** | | **$8,078,800.00** |
| | | | | |
| **MILLER** | 10/20/2024 | 11,438 | $202.05 | $2,311,047.90 |
| **Former Director** | 10/30/2024 | 18,562 | $200.56 | $3,722,794.72 |
| | **Total:** | **30,000** | | **$6,033,842.62** |
| | | | | |
| **BEST Current Chief Accounting Officer** | 11/12/2024 | 20,821 | $214.61 | $4,468,394.81 |

[3] Defendant Bisignano reported additional sales in Form 144s after his resignation in connection with his appointment as Commissioner of the Social Security Administration.  These sales are not included in the analysis because the Form 144 disclosures were unreliable.

| | | | |
|---|---:|---|---:|
| Total: | 20,821 | | $4,468,394.81 |
| | | | |
| | | | |
| Total: | 235,821 | | $44,299,073.31 |

## DAMAGES TO FISERV

109. As a result of the Individual Defendants' improprieties, Fiserv disseminated improper, public statements concerning the forced migration of Payeezy customers to Clover, the unsustainable growth that the migration caused, and the loss of those customers to competitors due to pricing. These improper statements have devastated Fiserv's credibility as reflected by the Company's $16.6 billion, or 17.93%, market capitalization loss.

110. Fiserv's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, Fiserv's current and potential customers consider Fiserv's ability to act ethically and fairly. Businesses are less likely to join Fiserv when they know that they could be forced into a more expensive service, which is what happened with the transition to Clover. Fiserv's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

111. Further, as a direct and proximate result of the Individual Defendants' actions, Fiserv has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws;

(b)     costs incurred from overpaying approximately $1.8 billion to repurchase shares;

(c)     costs incurred from forcing customers into joining Clover, including, but not limited to the loss of those customers; and

(d)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Fiserv.

112.    In addition, the Insider Selling Defendants utilized the Company's assets, its material nonpublic information, to benefit themselves.   Accordingly, the Insider Selling Defendants must disgorge any benefit they received from utilizing this information back to Fiserv.

## DEMAND ALLEGATIONS

113.    Plaintiff brings this action derivatively in the right and for the benefit of Fiserv to redress injuries suffered, and to be suffered, by Fiserv as a direct result of violations of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Fiserv is named as a nominal defendant solely in a derivative capacity.

114.    Plaintiff will adequately and fairly represent the interests of Fiserv in enforcing and prosecuting its rights.

115.    Plaintiff was a shareholder of Fiserv at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Fiserv shareholder.

116.    On August 28, 2025, plaintiff sent his Demand to defendants Lyons, Simons, DiSimone, De Castro, Warren, Mamilli, Yarkoni, Fritz, Gopal, and Cohen (the "Demand Directors"), demanding that they investigate, address, remedy, and commence proceedings against certain current and former officers and directors of the Company for violations of securities law,

breach of fiduciary duty, waste of corporate assets, and unjust enrichment. Plaintiff urged the Demand Directors to commence these legal proceedings as expeditiously as possible, and to secure tolling agreements from all potential defendants. Plaintiff also demanded that the Demand Directors reform and improve the Company's corporate governance and internal procedures to comply with all applicable laws and to protect Fiserv from committing future wrongful or wasteful acts. Specifically, plaintiff demanded that the Demand Directors: (i) strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; (ii) strengthen the Company's controls over Fiserv's accounting and financial reporting; (iii) strengthen the Company's disclosure controls; (iv) establish a system for intake of employee complaints regarding potential violations of laws occurring at the Company; and (v) permit the shareholders of Fiserv to nominate at least three independent candidates for election to the Board.

117. On September 15, 2025, Demand Counsel acknowledged receipt of plaintiff's Demand and informed plaintiff that the Board "is aware of your letter dated August 28 and the demands asserted therein purportedly on behalf of an alleged Fiserv stockholder. The Board of Directors will consider those demands in accordance with governing Wisconsin law. We will advise you of any further actions taken by the Fiserv Board of Directors in connection with this matter." Demand Counsel did not respond to any of the reforms proposed in the Demand, inform plaintiff of any action taken to secure tolling agreements, or inform plaintiff of any investigation into the wrongdoings described in the Demand.

118. Over ninety days have passed since plaintiff made his Demand and the Demand Directors and Demand Counsel have not indicated that the Demand Directors have taken any actions to reform or improve the Company's corporate governance and internal procedures. The

Demand Directors have not taken any steps into investigating the wrongdoing described in the Demand. In fact, the Demand Directors have refused to make any decisions regarding whether to accept or reject the Demand.

119. The Demand Directors' failure to initiate litigation, secure tolling agreements, or conduct a reasonable investigation was not a valid exercise of business judgment entitled to any presumption of reasonableness and good faith under the law. Accordingly, the Company remains exposed to additional harm from the wrongful conduct described herein and is not protected against the running of the statute of limitations. Further, plaintiff has not received a substantive response to the Demand.

## <u>COUNT I</u>

**Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder**

120. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121. During the period of wrongdoing, the Individual Defendants disseminated or approved false or misleading statements about Fiserv, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and defendants' course of conduct artificially inflated the price of the Company's common stock.

122. While the price of the Company's common stock was inflated due to the false and misleading statements made by the Individual Defendants, the Director Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices. The Director Defendants engaged in a scheme to defraud Fiserv by causing the Company to repurchase $6.9 billion in shares of its own stock at artificially inflated prices.

- 49 -

123. The Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Fiserv in connection with the Company's repurchases of its own stock during the period of wrongdoing.

124. The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of Fiserv stock, which were intended to, and did: (a) deceive Fiserv and its shareholders regarding, among other things, the trend-right strategy and shrink; (b) artificially inflate and maintain the market price of Fiserv's stock; and (c) cause Fiserv to repurchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the period of wrongdoing, the defendants were in possession of material, nonpublic information regarding the above.

125. The Individual Defendants were among the senior management and directors of the Company, and were therefore directly responsible for, and are liable for, all improper statements made during the period of wrongdoing, as stated above.

126.    The Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that the defendants should have been aware of them.  Throughout the period of wrongdoing, the defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

127.    The Individual Defendants' false or misleading statements and omissions were made in connection with the repurchases of Fiserv stock by the Company.

128.    As a result of the Individual Defendants' misconduct, Fiserv has and will suffer damages because it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing were disclosed.

129.    Fiserv would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

130.    As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages in connection with the repurchases of Fiserv stock during the period of wrongdoing.  By reason of such conduct, the Individual Defendants are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

131.    Plaintiff, on behalf of Fiserv, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

132.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.    The Individual Defendants, by virtue of their positions with Fiserv and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Fiserv and officers and directors who made the false and misleading statements alleged herein within the meaning of section 20(a) of the Exchange Act.  The Individual Defendants had the power and influence—and exercised that power—to cause Fiserv to engage in the unlawful conduct and practices complained of herein.

134.    Plaintiff, on behalf of Fiserv, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty

135.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136.    The Individual Defendants owed and owe Fiserv fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Fiserv the highest obligation of loyalty and care.

137.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the misconduct described herein.

138.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public

statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly, recklessly, and for the purpose and effect of artificially inflating the price of the Company's securities.

139. The Individual Defendants failed to correct or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact described herein, rendering them personally liable to the Company for breaching their fiduciary duties.

140. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its disclosures and the unsustainable revenue growth. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate assets.

141. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein, which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants failed to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

142. The Risk Committee Defendants breached their fiduciary duty of loyalty by failing to mitigate material risks to the Company during their tenure on the Risk Committee, which they knew or were reckless in not knowing. The Risk Committee Defendants failed in their duty to mitigate the risks caused by the Clover transition and the materially false and misleading

statements, as required by the Risk Committee Charter in effect at the time.

143. The Insider Selling Defendants breached their duty of loyalty by selling Fiserv stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's shareholders. The information described above was material, nonpublic information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Fiserv common stock.

144. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Fiserv has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

145. Plaintiff, on behalf of Fiserv, has no adequate remedy at law.

<u>**COUNT IV**</u>

**Against the Individual Defendants for Waste of Corporate Assets**

146. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147. As a result of the Company's inadequate controls and materially false and misleading statements concerning the back book and unsustainable revenue growth, the Individual Defendants have caused Fiserv to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty. The Director Defendants further wasted the Company's assets by causing Fiserv to repurchase over $6.9 billion in shares of its own stock at artificially inflated prices.

148. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

149.    Plaintiff, on behalf of Fiserv, has no adequate remedy at law.

**COUNT V**

**Against the Individual Defendants for Unjust Enrichment**

150.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Fiserv.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Fiserv.

152.    The Insider Selling Defendants sold Fiserv stock while in possession of material, nonpublic information that artificially inflated the price of Fiserv stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

153.    Plaintiff, as a shareholder and representative of Fiserv, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

154.    Plaintiff, on behalf of Fiserv, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Fiserv, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing Fiserv to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Fiserv and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following corporate governance policies:

1.      a provision to control insider selling;

2.      a proposal to strengthen the Board's oversight with respect to stock repurchases;

3.      a proposal to strengthen Fiserv's oversight of its disclosure procedures;

4.      a proposal to strengthen the Company's controls over financial reporting;

5.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

6.      a proposal to strengthen the Company's controls over risk management; and

7.      a provision to permit the shareholders of Fiserv to nominate at least three candidates for election to the Board.

C.      Extraordinary equitable and injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Fiserv has an effective remedy;

D. Awarding to Fiserv restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated: February 3, 2026

**DeWITT LLP**

*Electronically signed by Olivia M. Kelley*
Shannon A. Allen (#1024558)
Olivia M. Kelley (#1056759)
13845 Bishops Drive, Suite 300
Brookfield, WI 53005-6617
Telephone: (262) 754-2863
E-mail: saa@dewittllp.com
   omk@dewittllp.com

Barret V. Van Sicklen (#1060852)
2 East Mifflin Street, Suite 600
Madison, WI 53703-2865
Telephone: (608) 252-9386
Facsimile: (608) 252-9243
E-mail: bvv@dewittllp.com

**ROBBINS LLP**
Brian J. Robbins
Stephen J. Oddo
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
   soddo@robbinsllp.com

*Attorneys for Plaintiff*